IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03389-NYW

RAYMOND HATCHER,

     Plaintiff,

v.

CAROLYN W. COLVIN,

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This civil action comes before the court pursuant to Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-83(c) for review of the Acting Commissioner of Social Security's final decision denying Plaintiff Raymond Hatcher's application for Supplemental Security Income ("SSI"). Pursuant to the Order of Reference dated November 17, 2015, this civil action was referred to the Magistrate Judge "for all purposes" pursuant to the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and Title 28 U.S.C. § 636(c). *See* [#32]. The court has carefully considered the Amended Complaint filed February 3, 2015 [#8], Defendant's Answer filed May 21, 2015 [#16], Plaintiff's Opening Brief filed July 21, 2015 [#23], Defendant's Response Brief filed August 17, 2015 [#27], Plaintiff's Reply Brief filed August 20, 2015 [#28], the entire case file, the administrative record, and applicable case law. For the following reasons, I respectfully AFFIRM the Commissioner's decision.

**PROCEDURAL HISTORY**

On March 13, 2012, Plaintiff Raymond Hatcher ("Plaintiff" or "Mr. Hatcher"), filed a Title XVI application with an alleged onset date of August 30, 2011.  At the time of the alleged onset date, Mr. Hatcher was 19 years old, had some high school education, and had no past relevant work experience.  The application was initially denied on July 9, 2012.  [#17-2 at 93].[1] Plaintiff thereafter requested a hearing and appeared with counsel before Administrative Law Judge Stanley R. Hogg ("ALJ") on August 9, 2013.  [#17-2 at 31-57].  The ALJ issued an unfavorable decision as to Plaintiff's Title XVI claim on August 26, 2013, finding that Mr. Hatcher had not been disabled from the date the application was filed through the date of his decision.  [#17-2 at 15-26].  On September 10, 2013, Plaintiff filed a "Request for Review of Hearing Decision," which the Appeals Council denied on October 16, 2014.  [#17-2 at 10-11, 1-5].  Mr. Hatcher thereafter timely filed this civil action.

At the administrative hearing, Plaintiff testified that he suffers from a seizure disorder and that on August 30, 2011, he had suffered a fall and subsequent head injury as a result of one seizure.  [#17-2 at 36, 20].  Following his fall, the frequency of his seizures became highly variable; Plaintiff could finish a week without experiencing a single seizure, or he might experience up to ten.  [#17-2 at 37].  He started medication in August 2012 that helped to significantly reduce his seizures.  [*Id.*]  Plaintiff further testified that he has problems with focus and concentration.  [#17-2 at 38].  In March 2013, Plaintiff began living in a group home, where

---

[1] The court uses this designation to refer to the Electronic Court Filing system ("ECF") document number attached to the Administrative Record and the page number of the Administrative Record as it was filed by the Parties.  Plaintiff's citations and Defendant's citations similarly refer to the page number of the Administrative Record, or, where applicable, the page number of a brief.  *See, e.g.,* [#23 at 2; #27 at 2].

he receives help remembering when to take his medication and when to refill his prescriptions. [#17-2 at 39-40].

Plaintiff testified that he had seen a psychologist for a period of time and described the issues as including mood swings, "I get overwhelmed…I can do a complete 180 on my personality without intending to.  And then I'll go from being a nice guy to a mean guy, or I'll just have a panic; not necessarily a panic attack, but I'll start to worry, and stress out, and overstress myself."  [#17-2 at 41].  Plaintiff represented that he feels this way once a month, "at most."  [*Id.*]  Plaintiff also testified that he enjoys spending time with other people, "because I feel safer when others are around, in case I do have a seizure."  [#17-2 at 38].  He has several friends with whom he spends time.  [#17-2 at 42].  Plaintiff testified that he smokes marijuana approximately twice a week, both socially and to alleviate effects of a seizure.  [#17-2 at 42-43].  Plaintiff previously worked at a hot dog stand preparing and serving food and left as a result of lay-offs.  When asked by his attorney why he would have difficulty keeping a job, Plaintiff responded:

> I think, if it was a job and something that I was actually interested in, such as, like, finding a specific job for electronic-related things, or video game-related things, or food-related things, like, working as a waiter in a restaurant, or a cook, or something, then it would keep my interest, to the point where I'd probably be able to work; but I'm not 100 percent sure, because since I cracked my skull, my mind tends to wander a lot easier.

[#17-2 at 43-44].

In response to questioning by the ALJ, Plaintiff testified that he has no problem using his hands; and when he socializes with his friends they "go anywhere, from a restaurant, to a bar, to their apartment, to a library, to a mall.  It really depends on how we're feeling that day and what the—our schedules are looking like for said day."  [#17-2 at 45].  Plaintiff also testified that he is responsible for buying his own groceries.  [*Id.*]

Linda Hatcher, Plaintiff's mother, also testified at the hearing. She stated that following his accident, Plaintiff was treated for a brain bleed and recovered in the intensive care unit for ten days. He then received occupational, speech, and physical therapy for a traumatic brain injury. [#17-7 at 230]. Plaintiff lived in her home for a few months where she administered his medicine and ensured he was safe. Ms. Hatcher testified that Plaintiff cannot live alone because he could not remember to take certain medication properly and cannot follow complex instructions, "he can't follow a series of directions, so the—everything has to be really simple and really clear." [#17-2 at 48-49]. After he moved into the group home, she saw him approximately once a week. [#17-2 at 47]. She supported his move to the group home because she believed the environment would allow him to achieve independence appropriate for his age while offering necessary supervision and assistance with regard to his medicine, attending appointments, keeping his apartment clean, and similar tasks. [#17-2 at 48]. Ms. Hatcher further testified that Plaintiff requires a lot of supervision to complete a task, and since the injury, Plaintiff "can just go from zero to, just, ballistic for no reason, and it's so uncharacteristic." [#17-2 at 50].

Deborah Christiansen testified as a vocational expert ("VE"). The ALJ first asked the VE whether jobs were available for an individual who is limited to performing simple, routine tasks with one- and two-step instructions, who could occasionally interact with co-workers, supervisors, and the public, and who could not drive, work around machinery, climb, or perform at heights. [#17-2 at 52]. The VE responded that such an individual could work as a cleaner/housekeeping, a final assembler, or as a lens inserter. [#17-2 at 53]. As a second scenario, the ALJ asked the VE what jobs would be available with the above limitations if the individual could tolerate only minimal interaction with co-workers, supervisors, or the public,

*i.e.*, interacting less than one third of the work day.  [*Id.*]  The VE responded that the same three jobs would remain available.  The ALJ and VE agreed that no job could accommodate zero interaction with supervisors or co-workers.  The ALJ posed a third scenario, in which the individual has an IQ of 89, has average perceptual reasoning and memory skills, can accurately solve general problems as well as others of his age, is limited to jobs that require good fingering and fine manipulation, and has very low average processing speed "to the extent he is unable to perform daily tasks that require speed, visual scanning efficiency, automaticity, and perceptual speed."[2]  [#17-2 at 54].  This individual was similarly limited to simple one- and two-step job instructions with occasional interaction with co-workers, supervisors, and the public and the restrictions identified above.  The VE testified that such an individual could perform the duties of cleaner/housekeeping.  [#17-2 at 55].  The ALJ then asked the VE to return to the first hypothetical, to which he added the requirement that close supervision be available.  [*Id.*]  The VE responded that such an individual would not be eligible for competitive employment.  [*Id.*]

The ALJ issued his written decision on August 26, 2013, concluding that Mr. Hatcher had not been disabled for SSI purposes within the meaning of the Act from March 13, 2012, the date the application was filed.[3]  [#17-2 at 12].  Plaintiff requested review of the ALJ's decision [#17-2 at 10], which the Appeals Council denied on October 16, 2014.  [#17-2 at 1].  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this

---

[2] The ALJ defined processing speed as "requiring the ability to analyze visual material and produce quick motor responses to transfer written designs."  [#17-2 at 54].

[3] The ALJ repeatedly references January 25, 2012 as the application date; however, the Parties and the record refer to March 13, 2012 as the application date, and that is the date this court uses.  *Compare* [#17-2 at 17] *with* [#23 at 2, #27 at 2, #17-5 at 151].

action on December 16, 2014. The court has jurisdiction to review the final decision of the Commissioner. 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole. *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007). The court may not reverse an ALJ simply because he may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002). *See also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted). However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal

citation omitted).   Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."   *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### I.   The ALJ's Decision

An individual is eligible for SSI benefits under the Act if he is financially eligible, files an application for SSI, and is disabled as defined in the Act.   42 U.S.C. § 1382.   An individual is determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…."   42 U.S.C. § 1382c(a)(1)(3)(B).   The Social Security Disability Insurance Program established by Title II of the Social Security Act, 49 Stat. 622, as amended, 42 U.S.C. § 401 *et seq.*, provides for the payment of disability benefits only to those who have previously contributed to the program and who suffer from a mental or physical disability.   *See Bowen v. City of New York,* 476 U.S. 467, 470, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). By contrast, the Supplemental Security Income Program, established by Title XVI of the Social Security Act, 86 Stat. 1465, as amended, 42 U.S.C. § 1381 *et seq*., provides for the payment of disability benefits based solely on an individual's indigent status and is therefore a need-based program available to claimants independent of their prior social security contributions.   *See Bowen,* 476 U.S. at 470.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act.   20 C.F.R. § 416.920(a)(4).   *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.  Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied.  *Id.*  Step two considers whether the claimant has a medically severe impairment or combination of impairments, as governed by the Secretary's severity regulations.  *Id.*; *see also* 20 C.F.R. § 416.909.  If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.  *Williams*, 844 F.2d at 750.  Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 416.920(a)(4)(iii).  *Id.*  At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity (RFC), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability."  *Williams*, 844 F.2d at 751.  The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work.  *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")).  "The claimant bears the burden of proof through step four of the analysis."  *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .

> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> …

> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52.  The Commissioner can meet his or her burden by the testimony of a vocational expert, so long as the question posed to the vocational expert accurately portrays Plaintiff's limitations as supported by the record. *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000); *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992).

Following the five-step evaluation process, the ALJ determined that Mr. Hatcher: (1) had not engaged in substantial gainful activity since March 13, 2012, the application date; (2) had severe impairments of traumatic brain injury, epilepsy, and possible personality disorder; and (3) did not have an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).  [#17-2 at 17].  At step four, the ALJ found that Plaintiff had an RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations:

> he is limited to simple routine tasks that involve 1 and 2 step instructions; does not require more than occasional interaction with supervisors, co-workers, or the public; does not require operating a motor vehicle as part of the job, does not require any climbing, and does not require exposure to unprotected heights or moving machinery.

[#17-2 at 19].  The ALJ considered Plaintiff's age of 19 years old on the alleged disability onset date, that he has some high school education and is able to communicate in English, and the fact that he had no past relevant work experience, and his RFC, and determined that jobs exist in the national economy in significant numbers that Plaintiff can perform.  [#17-2 at 25].  Accordingly, the ALJ concluded that Plaintiff was not disabled.

Mr. Hatcher advances one argument, that the ALJ erred in failing to properly weigh the opinions of the medical providers.  *See* [#23 at 8-13].  Additionally, Plaintiff's opening brief appears to advance a second argument that evidence introduced for the first time to the Appeals Council requires remand.

## II.    Weight Given to Medical Opinions

In assessing Mr. Hatcher's RFC, the ALJ considered the opinions of treating psychiatrist Brian Wise, M.D., consultative psychologist Frederick G. Leidal, Psy.D., consultative psychologist Frederick Malmstrom, Ph.D., state agency psychiatric consultant Douglas Hanze, Ph.D., and school psychologist Nicole Speers.  The ALJ afforded considerable weight to Dr. Wise's opinion, moderate weight to Dr. Leidal's opinion, limited weight to Dr. Malmstrom's

opinion, substantial weight to Dr. Hanze's opinion, and moderate weight to Ms. Speers's opinion. [#17-2 at 22-24].

Mr. Hatcher appears to argue that the ALJ attributed too much weight to Dr. Wise and Dr. Hanze's opinions, and not enough weight to Dr. Malmstrom and Ms. Speers's opinions. *See* [#23 at 9-11]. Defendant contends that the ALJ properly considered the opinion evidence and provided good reasons for the weight given to each opinion of record, and thus the decision of the Commissioner should be affirmed. [#27 at 8-11].

A.    Applicable Law

The RFC assessment must consider and address medical source opinions. "[T]he opinion of a treating physician concerning the nature and extent of a claimant's disability is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (citation omitted). *See* 20 C.F.R. § 416.927(c)(2). If the ALJ determines that the treating physician's opinion is not well-supported, his inquiry at this stage is complete. *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. *Id.* The opinion is not entitled to controlling weight if the ALJ finds that it is either not well-supported, or not consistent with the other substantial evidence. *Id.*

"Treating source medical opinions are…entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§§] 404.1527 and 416.927." *Watkins*, 350 F.3d at 1300 (quoting Social Security Ruling (SSR) 96–2p, 1996 WL 374188, at *4). If the ALJ does not

attribute controlling weight to the treating source's opinion, he should demonstrate his consideration of the following: length of the treatment relationship and the frequency of examination ("[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"); the nature and extent of the treatment relationship ("[w]e will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories"); supportability ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion"); consistency ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"); specialization; and other factors "which tend to support or contradict the opinion." 20 C.F.R. § 416.927(c)(2)-(6). The ALJ's decision must be sufficiently specific so as to make clear the weight he gave to a medical opinion, but the ALJ is not required to expressly apply each of the factors in deciding what weight to give a medical opinion. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. *See* 20 C.F.R. § 416.927(c).

Nonetheless, "the assumption that the opinions of a treating physician warrant greater credit than the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration…" *Doyal*, 331 F.3d at 762 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965 (2003)). An ALJ may reject medical opinions in the record and reach

his own conclusion as to a claimant's RFC, so long as that conclusion is based on substantial evidence. *See Boss v. Barnhart*, 67 F. A'ppx 539, 542 (10th Cir. 2003) ("When a treating [source's] opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other [source's] reports to see if they outweigh the treating [source's] report, not the other way around") (citation omitted).   If an ALJ rejects a treating source's opinion, he must articulate "specific, legitimate reasons" for his decision. *Goatcher v. United States Dep't of Health & Human Servs.,* 52 F.3d 288, 290 (10th Cir. 1995) (quotations omitted).   The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all.  20 C.F.R. §  416.927(1), (2); SSR 96–6p, 1996 WL 374180, at *2.

B.    Application

The ALJ initially reviewed the testimony of Plaintiff and his mother along with the objective medical records of Plaintiff's seizure disorder and the treatment he received after the fall.  *See* [#17-2 at 20-22].  He found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that "in light of his ability to maintain his own apartment, do dishes and laundry, follow simple instructions, and socialize with friends, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully persuasive…"  [#17-2 at 22].   The ALJ then turned to the opinion evidence.

On March 16, 2013, Dr. Wise completed a medical source statement regarding Plaintiff's ability to perform work-related mental activities.  [#17-9 at 410-412].   Dr. Wise is the only medical professional who was designated as a treating source.   Plaintiff does not challenge this designation, and indeed he acknowledges six months of treatment with Dr. Wise.  *See* [#23 at 9].

Dr. Wise noted that Plaintiff could be psychotic and delusional, and assessed him as moderately limited in the ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions.  *See* [#17-9 at 410].  Dr. Wise assessed Plaintiff as markedly impaired in the ability to understand and remember complex instructions and carry out complex instructions, and extremely impaired in the ability to make judgments on complex work-related decisions.  [*Id.*]  Dr. Wise also assessed Plaintiff as moderately impaired in his ability to interact appropriately with supervisors, co-workers, and the public, and to respond appropriately to usual work situations and to changes in a routine work setting.  [#17-9 at 411].  The ALJ afforded considerable weight to this opinion based on the year-long treating relationship between the doctor and Plaintiff, the doctor's longitudinal view of Plaintiff's functioning, and the consistency of the opinion with the evidence as a whole.  [#17-2 at 23-24].  This determination is consistent with 20 C.F.R. § 416.927(c)(2), under which the ALJ gives more weight to the claimant's treating sources because they are often the "medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

Mr. Hatcher argues that the ALJ erred in affording considerable weight to Dr. Wise's opinion because the doctor never administered, or described administering, "a complete mental status examination," to support his finding that Plaintiff was only moderately impaired with regard to basic work functions.  [#23 at 9-10].  Plaintiff also argues that Dr. Wise "did not treat functioning problems but instead treated a psychosis," and that inconsistency lies in the record because, "the ALJ found the presence of post traumatic brain injury and a possible personality

disorder," whereas Dr. Wise spoke only of a psychotic disorder, which the ALJ "never found to exist." [#23 at 9-10]. However, while the ALJ has a duty to develop the administrative record, the claimant bears the burden of ensuring there is sufficient evidence in the record to suggest a reasonable possibility that a severe impairment exists. *Wall v. Astrue*, 561 F.3d 1048, 1063 (10th Cir. 2009). Mr. Hatcher was represented at the hearing and his counsel did not assert that a deficient record was before the ALJ. Furthermore, this court's review of Dr. Wise's progress notes reveals no findings that are contradictory to his conclusions. [#17-9 at 403-409 (spanning August 2012 to January 2013)].

Indeed, despite Plaintiff's argument regarding the incomplete nature of Dr. Wise's notes and treatment, the doctor's findings appear consistent with the other providers whose opinions received moderate and substantial weight from the ALJ. Dr. Leidal evaluated Plaintiff on May 11, 2012. [#17-7 at 283-289]. Following a fifty minute examination, he noted that Plaintiff is:

> capable of getting up in the am, dressing, bathing and taking care of personal hygiene needs. He seems independent with [activities of daily living], without limitations or restrictions. He helps clean up around the apartment, but is rather lethargic and mostly watches movies and plays video games. He may go for a walk to the library or movies.

[#17-7 at 285]. Dr. Leidal further noted that Plaintiff had a normal appetite, fair sleep and energy level, his "[a]bility to manage money, such as, shopping paying bills or simply counting change correctly seems functional,"[4] and "[s]ocial activities with family or friends appear age appropriate, with adequate social support." [*Id.*] Dr. Leidal observed that "[t]he level of assistance needed in planning or completing normal activities of daily living appears minimal at this time as the claimant seems to have functional adaptive skills." [*Id.*] With respect to the mental status exam administered on Plaintiff, Dr. Leidal noted that Plaintiff's "ability to

---

[4] Although Dr. Leidal later opined that "[s]hould the claimant receive benefits a payee may be necessary." [#17-7 at 288].

understand and comprehend simple language, in the form of simple verbal directions during the exam, appeared good," though his ability to understand "more complex directions and language seemed poor."   [#17-7 at 286].   Ultimately, Dr. Leidal assessed Plaintiff with below average ability in several areas, but observed that Plaintiff "has clearly shown the ability to follow the examiner's questions and directions, oral instructions on mental status and provide simple appropriate responses," and his "ability to perform a simple, repetitive task appeared fair."   [#17-7 at 288].   He placed Plaintiff's Global Assessment Functioning score at 59, indicating moderate to mild symptoms, and stated that more information was needed.   The ALJ noted that Dr. Leidal did not indicate the degree of limitation in his findings regarding Plaintiff's below average abilities, or provide a functional assessment of Plaintiff's residual capacities, and therefor attributed moderate weight to Dr. Leidal's opinion as to those findings; but the ALJ assigned considerable weight "to the unequivocal statement that the claimant retained a fair ability to perform simple routine tasks."   [#17-2 at 22].

On May 17, 2012, Dr. Hanze examined the medical evidence of Plaintiff's symptoms, and recommended an I.Q. and memory test; he did not perform an assessment at that time.   [#17-8 at 375].   Pursuant to this recommendation, Dr. Malmstrom evaluated Plaintiff on June 20, 2012.   Dr. Malmstrom summarized his findings in relevant part as follows:

> [t]he claimant is able to cooperate in the short term if given specific one-on-one supervision, but in my opinion he was not currently capable of cooperating with either supervisors and coworkers and is definitely not capable of handling his own funds and money in his own best interest, and will most likely require a payee.

[#17-9 at 382].   The ALJ attributed limited weight to Dr. Malmstrom's assessment that Plaintiff could not cooperate or interact with supervisors and coworkers for the following reasons: Plaintiff performed significantly better on a similar evaluation taken by Dr. Leidal two months prior; there was no evidence Plaintiff would be unable to cooperate with supervisors or

coworkers, "as he appears to get along adequately with others"; and "[t]he evidence demonstrates that [Plaintiff] is able to follow simple instructions, as he has done so on multiple occasions. [#17-2 at 23]. The ALJ also noted that Dr. Leidal had observed Plaintiff with fair hygiene and, just two months later, Dr. Malmstrom had observed Plaintiff with extremely poor hygiene and a distinct body odor. [*Id.*]

On July 7, 2012, Dr. Hanze reviewed the evidence again and opined that Plaintiff was capable of performing one and two-step work. *See* [#17-9 at 383]. The ALJ gave this opinion substantial weight on the basis that the psychologist, "is a highly qualified expert who had access to the claimant's record to July 2012, including the reports and the claimant's statements of activities, and his opinion is consistent with the evidence as a whole, as the claimant has demonstrated the ability to perform one and two-step work." [#17-2 at 23]. Plaintiff argues Dr. Hanze provided only this one sentence recommendation with no support. [#23 at 11]. However, the evidence on which Dr. Hanze relied, in large part the reports of Dr. Leidal and Dr. Malmstrom, and further explanation of his conclusion are found elsewhere in the record. *See* [#17-3 at 69–79, 80–92]. Indeed, Dr. Hanze had the benefit of reviewing the comments and findings of both Dr. Leidal and Dr. Malmstrom and arriving at his own conclusion. *See* [#17-3 at 76, 87].

Finally, Ms. Speers administered an intelligence test for Plaintiff on April 16, 2013.[5] [#17-9 at 440-448]. She found that Plaintiff's cognitive ability was below average, his overall verbal reasoning skills were average, his perceptual reasoning skills were average, his memory

---

[5] Ms. Speers tested Plaintiff with the Wechsler Adult Intelligence Scale, 4th Edition, which she described as, "a cognitive measure used to assess abilities important to learning…[t]hese abilities, measured by a range of reasoning and conceptual tasks, reflect a person's current ability to problem-solve, think abstractly, and reason with novel information…[a]ll assessment procedures measure a limited sample of a person's total repertoire…[t]he selected measures should only be interpreted within the limits of their measured validity." [#17-9 at 441].

skills were average, and his processing speed was low.  [*Id.* at 441-442].  Ms. Speers determined that Plaintiff reasoned and processed verbal and visual-spatial information at a normal rate but had significant difficulty with his processing speed: "[w]hile [Plaintiff] can accurately solve general problems as well as others his age, his low processing speed significantly impacts his ability to consistently solve problems with day-to-day tasks that require speed, visual scanning efficiency, automaticity, perceptual speed, attention, and concentration."  [*Id.* at 442].  Ms. Speers also found that Plaintiff's "Broad Independence, an overall measure of adaptive behavior, is comparable to that of the average individual at age 6 years 4 months"; Plaintiff's "greatest strengths include his community living skills [and] [h]is lowest scores include his personal living skills." [#17-9 at 445].

The ALJ afforded moderate weight to Ms. Speers's assessment, "because the psychologist is an expert in administering psychometric tests, and the claimant showed average abilities in a number of areas"; the ALJ declined to afford greater weight because "the claimant's treating psychiatrist assessed him as more functional that this testing showed, and the claimant demonstrates greater functioning than Dr. Speers assessed."  [#17-2 at 24].  In support of this conclusion, the ALJ reviewed Ms. Speers's findings and noted that Plaintiff's I.Q. score was eleven points higher than when previously tested; and his composite scores suggested average overall verbal reasoning skills, average perceptual reasoning skills, average memory skills, and low processing speed.  [#17-2 at 24].  The ALJ further observed: "[o]verall, the claimant demonstrates marginally serious problem behavior, such as marginally serious internalized maladaptive behaviors and marginally serious asocial maladaptive behaviors…[i]t is unclear what is meant by 'marginally serious,' but it appears to mean that the claimant's behaviors are not fully serious." [*Id.*]

Plaintiff argues that while the ALJ summarized Ms. Speers's findings, he erred in interpreting Ms. Speers's description of "marginally serious" as "not fully serious." [#23 at 9 ("The response of marginally serious does not mean 'not serious' but on the upper cusp of serious.")]. Plaintiff further argues that the ALJ did not consider the entire treatment record in his assessment of Ms. Speers's findings, specifically the records "describing Hatcher as dysfunctional." [#23 at 10]. I respectfully disagree that the ALJ erred in his review of Ms. Speers's findings. The record before me demonstrates that the ALJ considered Ms. Speers's opinion, specified the weight attributed to the opinion, and provided an explanation for why the opinion was not adopted in its entirety. *See* 20 C.F.R. § 416.927(c), (e). The ALJ further explained that Plaintiff's slower processing speed "can be accommodated by limiting him to simple work tasks." [#17-2 at 24]. The court will neither reweigh the evidence nor substitute its judgment for that of the ALJ. *See White*, 271 F.3d at 1260. I find that the ALJ properly addressed the opinion evidence presented in the record.

## III. New Evidence

As to Plaintiff's limited argument that the ALJ failed to consider a record opining that Mr. Hatcher is dysfunctional, I similarly disagree that an error was committed. Plaintiff argues that the ALJ improperly failed to consider and discuss the treatment records from Arapahoe/Douglas Mental Health Network ("Arapahoe/Douglas Records") showing him as dysfunctional in terms of productivity. [#23 at 10 (citing #17-9 at 470-471), #28 at 4 (citing #17-9 at 470-471)]. As an initial matter, it is not apparent that the Arapahoe/Douglas Records were ever before the ALJ. Counsel for Plaintiff submitted to the Appeals Council additional evidence, which the Appeals Council incorporated into the record on October 16, 2014. *See* [#17-2 at 5]. The new evidence included the Arapahoe/Douglas Records. [*Id.*] The Appeals Council

considered the Arapahoe/Douglas Records and determined that the "information does not provide a basis for changing the [ALJ's] decision."   [#17-2 at 1-2].   The ALJ could not err in failing to consider records that were not before him, thus, Plaintiff's argument is really a challenge to the Appeals Council.   But Plaintiff fails to offer a well-developed argument as to any error by the Appeals Council related to the Arapahoe/Douglas Records, and this court declines to make arguments on behalf of the Parties, which they have not made themselves. *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself"); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).   This court simply notes that it is well settled that the court may take "the Appeals Council at its word when it declares that it has considered a matter." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

In any case, I find that the additional evidence does not change the ALJ's substantive determination of no disability, and therefore does not justify reversal or remand, for the following reasons.

A. <u>Applicable Law</u>

In the context of an application for SSI benefits, the submission of new evidence to the Appeals Council is governed by 20 C.F.R. § 416.1470(b), which instructs:

> [i]n reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. In reviewing decisions other than those based on an application for benefits, the Appeals Council shall evaluate the entire record including any new and material evidence submitted. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

If the Appeals Council determines that the newly submitted evidence is not new, material, or temporally relevant and therefore declines to consider it, that determination is reviewed *de novo*. *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (citation omitted). "If the evidence does not qualify, it plays no further role in judicial review of the Commissioner's decision." *Id.* (citation omitted). However, "if the evidence does qualify and the Appeals Council considered it in connection with the claimant's request for administrative review (regardless of whether review was ultimately denied), it becomes part of the record we assess in evaluating the Commissioner's denial of benefits under the substantial-evidence standard." *Id.* (citing *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994) (further citation omitted)). "Evidence is new within the meaning of [20 C.F.R. § 416.1470(b)] if it is not duplicative or cumulative." *Lawson v. Chater*, 83 F.3d 432, at *2 (10th Cir. Apr. 23, 1996) (unpublished) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). *See also Vigil v. Colvin*, No. 13-cv-01763-PAB, 2015 WL 5719641, at *10 (D. Colo. Sept. 30, 2015). "Evidence is material to the determination of disability if there is a reasonable possibility that [it] would have changed the outcome." *Lawson*, 83 F.3d at *2 (citing *Wilkins*, 953 F.2d at 96).

In this case, because the Appeals Council received additional evidence from the Arapahoe/Douglas Mental Health Network and made it part of the record, this court considers whether this additional evidence upsets the ALJ's determination. *See Martinez v. Astrue*, 389 F. App'x 866, 869 (10th Cir. 2010).

B. <u>Application</u>

The portions of the Arapahoe/Douglas Records that Mr. Hatcher identifies as not considered by the ALJ were generated on February 23, 2011, February 25, 2011, and April 10,

2013.  [#17-9 at 470].[6]  First, the court notes that Mr. Hatcher filed his application on March 13,

2012 alleging that his disability began on August 30, 2011.  [#17-5 at 151].  The ALJ wrote in

his decision that Plaintiff alleges that an August 30, 2011 brain injury left him with slow

movements, unsteady balance, slow processing speed, and that he is now confused, has a flat

affect, and is easily overwhelmed.  [#17-2 at 20].  Plaintiff testified at the hearing that the

problems he complains of began with the August 30, 2011 injury.  [#17-2 at 41].  While the ALJ

must generally develop the claimant's complete medical history, "for at least the 12 months

preceding the month in which you file your application," the ALJ may also truncate or elongate

the history if he has reason to believe that "your disability began less than 12 months before you

filed your application," or "development of an earlier period is necessary."  20 C.F.R.

416.920(a).  Although the ALJ did not state it expressly, I find that the record reflects a

conscious decision to focus the review of Plaintiff's medical history to the period following the

August 30, 2011 head injury based on Plaintiff's own representations regarding the onset of his

disability.  *See, e.g.,* [#17-2 at 44 (ALJ: "When you were working at the hot dog stand you said

you were doing cooking. What were you cooking?"  Plaintiff: "Hot dogs, and hamburgers, and

making, like, shakes and smoothies, and stuff, to that extent."  ALJ: "Did you have any difficulty

doing that?"  Plaintiff: "No."  ALJ: "Of course, that was before you had your - your injury,

right?"  Plaintiff: "Yes."); #17-2 at 48 (Ms. Hatcher: "I felt he needed supervision…clearly he

needs help because of his brain injury.")].  Because the portions of the Arapahoe/Douglas

Records dating from February 2011 were generated prior to the head injury resulting from the

seizure on August 30, 2011, there is no developed argument before this court, or independent

---

[6] The Arapahoe/Douglas Records also include notes from May and June 2013, which Plaintiff
does not raise as a basis for any challenge.  *See* [#17-9 at 456-460].  Plaintiff's failure to raise or
fully develop an argument in his opening brief results in waiver.  *See Bellon v. Colvin*, No. 13–
cv–01862–CMA, 2014 WL 1630217, at *4 (D. Colo. Apr. 23, 2014) (collecting cases).

reason to find, that the ALJ would have considered those records material had they been before him given Plaintiff's own testimony about the onset date of his disability.

With respect to the portion of the Arapahoe/Douglas Records that date from April 10, 2013 ("April 2013 Arapahoe/Douglas Records"), this evidence is chronologically relevant. *Vigil*, 2015 WL 5719641, at *10 ("Evidence is 'chronologically relevant' if it 'relates to the period on or before the date of the [ALJ's] decision.'") (citing *O'Dell*, 44 F.3d at 858)). However, I find that it is cumulative of evidence the ALJ reviewed and addressed in his decision. As mentioned before, Plaintiff merely argues that the ALJ should have considered the opinion that he has "score of dysfunctional in productivity [sic]." [#23 at 10]. The April 2013 Arapahoe/Douglas Records are authored by Dean Peterson, LPC, CACIIL, who assessed Mr. Hatcher as having an extremely severe impairment with productivity, defined as: "[i]ndependently working, volunteering, homemaking, or learning skills for financial support." [#17-9 at 471]. However, there is no explanation in the record or in the Parties' briefing as to how this assessment was formulated. The notes state that very little information was known about Mr. Hatcher in making such an assessment: "[c]aseworker who comes with [Plaintiff] has absolutely no information about client, so we had to call the program manager to get some information…[p]er program manager…they are trying to get [Plaintiff] linked to benefits, and to have a provider to continue with client's medications." [#17-9 at 469]. Furthermore, this assessment occurred approximately four months before Plaintiff testified at the hearing. The ALJ articulated in his decision that he gave less weight to Ms. Speers and Dr. Malmstrom's opinions regarding Plaintiff's limitations in part because of Plaintiff's own testimony, which demonstrated to the ALJ that "the claimant retained a fair ability to perform simple routine tasks," and the "claimant is able to follow simple instructions, as he has done so on multiple

occasions." [#17-2 at 22, 23].  Finally, the ALJ declined to give greater weight to the opinions of Ms. Speers in part because Dr. Wise, the treating physician, had assessed Plaintiff "as more functional than [Ms. Speers's] testing showed, and the claimant demonstrates greater functioning than Dr. [sic] Speers assessed."

Accordingly, I respectfully conclude that the new evidence in the form of the Arapahoe/Douglas Records does not provide a basis for altering the ALJ's decision.  The ALJ may very well have reached the conclusion that Mr. Hatcher was not disabled were these records before him.  *See Hope v. Colvin*, No. 12–cv–03017–RBJ, 2014 WL 235859 (D. Colo. Jan. 22, 2014).  The ALJ's decision remains supported by substantial evidence, *see Brown v. Colvin*, 82 F. Supp. 3d 1274, 1279-80 (D. Colo. 2015), and thus I affirm the Commissioner's decision.

## CONCLUSION

The court is satisfied that the ALJ considered all relevant facts and that the record contains substantial evidence from which the Commissioner could properly conclude under the law and regulations that Mr. Hatcher was not disabled within the meaning of Title XVI of the Social Security Act.  Accordingly, **IT IS ORDERED** that the Commissioner's final decision is **AFFIRMED** and this civil action is **DISMISSED**, with each party to bear his and her own fees and costs.

DATED: March 23, 2016                    BY THE COURT:


                                         s/ Nina Y. Wang _____
                                         United States Magistrate Judge